UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Justin Orlando,<br><br>                              Plaintiff,<br><br>v.<br><br>The Kraft Heinz Company,<br><br>                              Defendant. | Civil No. 3:22-CV-01636 (JCH)<br><br><br><br>February 9, 2024 |

## RULING AND ORDER ON MOTION TO QUASH [ECF No. 82]

The Plaintiff, Justin Orlando, brings the present action against his former employer, The Kraft Heinz Company ("Kraft Heinz"), alleging retaliation and discrimination under Section 31-51q of the Connecticut General Statutes.  Before the Court is the Plaintiff's motion to quash a subpoena that Kraft Heinz served on his previous employer, Pepperidge Farms, requesting five classes of employment records.  (ECF No. 82.)  For the reasons set forth below, the motion will be granted in part and denied in part.  The subpoena will be ordered modified as to two classes of records, and quashed as to the remaining three.

### I.   BACKGROUND

The Plaintiff worked as a sales executive for Kraft Heinz beginning in 2020.  (Am. Compl., ECF No. 17, ¶ 1; *see also* ECF No. 89, at 10.)  In 2022 the company learned that he had once attended a Halloween party dressed as the fictional detective Rico Tubbs from the 1980s television show, *Miami Vice.*  As part of his costume, the Plaintiff had "change[d] the complexion of his skin" to match that of the African American actor who had portrayed Detective Tubbs, Philip Michael Thomas.  (Am. Compl., ECF No. 17, ¶¶ 1, 22.)  The parties evidently dispute whether to

characterize this "change" as mere "makeup," or as "blackface" (*cf. id.* ¶¶ 1, 23), but in any event, Kraft Heinz investigated the affair. (*Id.* ¶ 2; *see also* Def.'s Ans. & Aff. Defenses, ECF No. 22, ¶ 2.) Upon completion of its investigation the company terminated the Plaintiff's employment, allegedly because he was "unwilling to acknowledge and take ownership of the inappropriateness and offensiveness of his conduct that was contrary to [Kraft Heinz's] leadership principles and violative of its Code of Conduct." (*Id.*)

The Plaintiff filed this lawsuit alleging that his termination violated Section 31-51q of the Connecticut General Statutes, a law that extends certain First Amendment protections into private workplaces. (Compl., ECF No. 1, ¶ 40.) He then amended his complaint, and Kraft Heinz answered that complaint and asserted several affirmative defenses. (Def.'s Ans. & Aff. Defenses, ECF No. 22.) Its fifth affirmative defense alleged that "Plaintiff's claims are barred in whole or in part by the doctrine of after-acquired evidence." (*Id.* at 6.)

In part to develop this after-acquired evidence defense, Kraft Heinz prepared a subpoena for service upon the Plaintiff's prior employer, Pepperidge Farm. (ECF No. 82-2.) The subpoena seeks, among other things, "[c]opies of applications for employment"; "[d]ocuments that identify Plaintiff's position(s) and . . . duties"; "[d]ocuments . . . reflecting the reasons why Plaintiff no longer works for Pepperidge Farm"; "[d]ocuments . . . evidencing any stock awards . . . including [when he] sold or cashed them out"; and "[d]ocuments . . . to determine [the] components of Plaintiff's gross pay . . . for 2018, 2019 and 2020." (*Id.*) The relevance that Kraft Heinz claims to observe in these documents will be discussed below.

The Plaintiff moved to quash the subpoena (ECF No. 82), and Kraft Heinz filed an opposition. (ECF No. 89.) The Court allowed reply and sur-reply briefs. (ECF Nos. 90-1, 95-1.) Neither party requested oral argument, and the motion is therefore ripe for decision.

**II.    DISCUSSION**

    **A.    Relevant Legal Principles**

        ***1.    A party's standing to move to quash a subpoena served on a non-party***

Federal Rule of Civil Procedure 45 allows a party to serve a subpoena for production of documents on a non-party. Fed. R. Civ. P. 45(a)(1). The non-party may object, and may move to quash, if the subpoena "(1) 'fails to allow a reasonable time to comply'; (2) requires a non-party to travel beyond certain geographical limits; (3) requires disclosure of privileged materials; (4) subjects a person to 'undue burden'; (5) requires disclosure of 'a trade secret or other confidential research, development, or commercial information'; or (6) requires disclosure of certain expert opinions." *Strike 3 Holdings, LLC v. Doe*, No. 3:19-cv-115 (JBA) (RMS), 2019 WL 2066963, at *2 (D. Conn. May 10, 2019). A motion to quash is not an all-or-nothing proposition; the Court may not only grant or deny such a motion, but it may also order the subpoena modified if appropriate. *See* Fed. R. Civ. P. 45(d)(3); *Dapkus v. Arthur J. Gallagher Serv. Co., LLC*, No. 3:19-cv-1583 (KAD) (TOF), 2021 WL 83479, at *7-8 (D. Conn. Jan. 11, 2021) (declining to quash subpoena in its entirety but ordering it modified to address privacy objection).

In some instances, a party may not object to a subpoena served on a non-party. As the Second Circuit has explained, "[i]n the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness." *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975). For example, a party "lacks standing to challenge . . . nonparty subpoenas on the basis of burden." *A & R Auto Body Specialty & Collison Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07-cv-929 (WWE) (HBF), 2013 WL 6511934, at *2 (D. Conn. Dec. 12, 2013). This is because "[t]he burden of complying with the subpoena will

fall on the non-party" rather than the party. *Strike 3 Holdings, LLC v. Doe*, No. 3:18-cv-1561 (VLB) (RMS), 2019 WL 1620414, at *4 (D. Conn. Apr. 16, 2019).

In other instances, the party may properly object. As a leading case explains, parties can object if the subpoenaed information implicates their "personal privacy right[s]" or "privilege[s]." *Jacobs v. Conn. Cmty. Tech. Colleges*, 258 F.R.D. 192, 195 (D. Conn. 2009). In that case, the court recognized the plaintiff's standing to move to quash subpoenas served on his mental health care providers, because he "clearly ha[d] a personal privacy right and privilege with respect to the information contained in his psychiatric and mental health records." *Id.* Similarly, courts have recognized that bank account holders have standing to move to quash subpoenas served on their banks, because of their "personal privacy rights" in their financial records. *E.g., Chazin v. Lieberman*, 129 F.R.D. 97, 98 (S.D.N.Y. 1990).

Importantly for this case, courts have recognized parties' standing to move to quash subpoenas served on their employers or former employers. In *Chamberlain v. Farmington Savings Bank*, for example, Judge Smith held that a plaintiff could move to quash subpoenas served on his former employers because he "clearly ha[d] a personal right with respect to information contained in his employment records." No. 3:06-cv-1437 (CFD) (TPS), 2007 WL 2786421, at *1 (D. Conn. Sept. 25, 2007); *see also Bernstein v. Mafcote*, No. 3:12-cv-311 (WWE) (HBF), 2014 WL 3579494, at *2 n.3 (D. Conn. July 21, 2014). Similarly, in *Warnke v. CBS Corp.* the court recognized the plaintiff's standing to challenge subpoenas served on his employers because he had "a legitimate privacy interest" in the information that would be revealed. 265 F.R.D. 64, 66 (E.D.N.Y. 2010).

4

### 2.     *Relevance*

The information sought by a non-party subpoena must be relevant to the case. As Judge Garcia recently observed, "[a] subpoena issued to a non-party pursuant to Rule 45 is subject to Rule 26(b)(1)'s overriding relevance requirement, which provides that information is generally discoverable if it is relevant to any party's claim or defense, proportional to the needs of the case, and not privileged." *Berkelhammer v. Voya Institutional Plan Servs., LLC*, No. 3:22-mc-99 (MEG), 2023 WL 5042526, at *2 (D. Conn. Aug. 8, 2023). Judge Garfinkel put it even more succinctly: "Rule 45 subpoenas are subject to the relevance requirements set forth in Rule 26(b)." *Crespo v. Beauton*, No. 15-cv-412 (WWE) (WIG), 2016 WL 259637, at *2 (D. Conn. Jan. 21, 2016); *accord Doe v. Wesleyan Univ.*, No. 3:19-cv-1519 (JBA) (TOF), 2021 WL 2525427, at *2 (D. Conn. June 21, 2021); *Main St. Am. Assur. Co. v. Savalle*, No. 3:18-cv-2073 (JCH) (SALM), 2021 WL 1399685, at *1 (D. Conn. Apr. 14, 2021).

Information sought by a non-party subpoena is "relevant" if it makes a material fact more or less likely to be true. "While the Federal Rules of Civil Procedure do not define 'relevant,' the operative definition can be found in Rule 401 of the Federal Rules of Evidence." *Gaynor v. City of Meriden*, No. 3:17-cv-1103 (CSH), 2019 WL 2537669, at *2 (D. Conn. June 20, 2019). Under that rule, "[i]nformation is 'relevant' if it '(a) has any tendency to make a fact more or less probable than it would be without the evidence, and (b) the fact is of consequence in determining the action.'" *Conservation L. Found. v. Shell Oil Co.*, No. 3:21-cv-933 (JAM) (TOF), 2023 WL 5434760, at *10 (D. Conn. Aug. 22, 2023); *see also Huseby, LLC v. Bailey*, No. 3:20-cv-167 (JBA) (TOF), 2021 WL 3206776, at *6 (D. Conn. July 29, 2021).

The concept of relevance is broadly construed at the discovery stage. "In part because the concept of relevance is not limited by considerations of evidentiary admissibility at the discovery

5

stage, *see* Fed. R. Civ. P. 26(b)(1), 'it is well established that relevance for purposes of discovery is broader in scope than relevance for the purpose of the trial itself.'" *Conservation L. Found.*, 2023 WL 5434760, at *10 (quoting *Vaigasi v. Solow Mgmt. Corp.*, No. 11-cv-5088 (RMB) (HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016). Put differently, relevance is "an extremely broad concept" during the discovery phase of the case. *Martino v. Nationstar Mortg. LLC*, No. 3:17-cv-1326 (KAD), 2019 WL 2238030, at *1 (D. Conn. May 23, 2019).

When disputes arise, the party that served the subpoena bears the burden of showing the relevance of the requested information. As Judge Merriam put it, "[t]he party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Torcasio v. New Canaan Bd. of Educ.*, No. 3:15-cv-53 (AWT) (SALM), 2016 WL 312102, at *2 (D. Conn. Jan. 26, 2016) (quoting *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011). Yet once the requesting party makes this demonstration, the burden shifts to the opposing party to show why the discovery should be denied. *Libaire*, 760 F. Supp. 2d at 291 ("Once the party issuing the subpoena has demonstrated the relevance of the requested documents, the party seeking to quash the subpoena bears the burden of demonstrating that the subpoena is overbroad, duplicative, or unduly burdensome."); *accord Doe*, 2021 WL 2525427, at *2 ("Wesleyan having demonstrated the relevance of the" subpoenaed information, "the burden shifts to the plaintiff to justify curtailing discovery.") (citation and quotation marks omitted); *cf. Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009) (holding, in the context of Rules 33 and 34, that "[t]he party resisting discovery bears the burden of showing why discovery should be denied").

### 3. *After-acquired evidence*

The Supreme Court has recognized an after-acquired evidence defense in employment cases. In *McKennon v. Nashville Banner Publishing Co.,* a newspaper fired an employee and later conceded that it did so because of her age, in violation of the Age Discrimination in Employment Act. 513 U.S. 352, 355 (1995). During the discovery phase of the case, however, it learned that she had "copied several confidential documents bearing upon the company's financial condition." *Id.* The newspaper contended that it would have fired the employee if it had learned of the copying during her term of employment, and the Supreme Court was therefore called upon to consider whether an employee "is barred from all relief when, after her discharge, the employer discovers evidence of wrongdoing that, in any event, would have led to the employee's termination on lawful and legitimate grounds." *Id.* at 354. The Court held that such an employer could not "be required to ignore the information," but could instead use it to limit the relief the employee could obtain, so long as the "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362-63; *see also Chamberlain*, 2007 WL 2786421, at *2 (stating that the after-acquired evidence defense "provides that an employee's relief can be limited by evidence of wrong-doing discovered after his or her termination that would have provided a legitimate basis for such termination").

Yet in the very same case, the Court noted the possibility that the defense could be used as a vehicle for discovery abuse. "The concern that employers might as a routine matter undertake extensive discovery into an employee's background or performance on the job to resist claims . . . is not an insubstantial one." *McKennon*, 513 U.S. at 363. The Court nonetheless recognized the defense because the potential for intrusive discovery could be controlled by "the authority of courts

to award attorney's fees . . . and to invoke the appropriate provisions of the Federal Rules of Civil Procedure." *Id.*

Heading this warning, courts have quashed subpoenas premised on an after-acquired evidence defense when the employer presents no reason to suppose that the subpoenaed records would reveal any terminable misconduct. As Judge Smith held almost twenty years ago, when a defendant offers "[no] evidence to suggest that the plaintiff may have misrepresented information" and fails to provide "any statements made by the plaintiff during his deposition or in response to interrogatories," the subpoena should be quashed. *Chamberlain*, 2007 WL 2786421, at *3. In *Bernstein*, for instance, the court denied discovery into plaintiff's prior employment records when the only evidence of misconduct was an allegation that he had lied in an unrelated deposition. 2014 WL 3579494, at *3. Similarly, in *Addona v. Parker Hannifin Corp.*, the court concluded that defendant "[fell] short of a sufficient basis to warrant discovery" when its only reason for believing plaintiff had lied on his employment application was that he claimed to have left his last employer to "seek other opportunities" but took a job with half the pay a few months later. No. 3:13-cv-1616 RNC, 2014 WL 788946, at *2 (D. Conn. Feb. 25, 2014).

Conversely, courts have allowed discovery when the employer provides some concrete reason to believe that the subpoenaed information will reveal evidence of terminable misconduct. In *Shah v. James P. Purcell Assocs., Inc.,* for example, the employer learned that the plaintiff had been operating a Dunkin' Donuts franchise on the side. No. 3:05-cv-306 (PCD), 2006 WL 1876662, at *1 (D. Conn. July 5, 2006). It served additional interrogatories to learn more, claiming that the information was relevant to an after-acquired evidence defense because it would have fired the plaintiff if it had known that he was running another business. *Id.* Judge Dorsey agreed, because under the facts of the case, "information regarding Plaintiff's Dunkin' Donuts franchise

8

is relevant to calculating damages." *Id.* Similarly, in *Padilla v. Sacks & Sacks, LLP*, the defendant learned through other discovery that the plaintiff had not actually worked for a law firm that she had listed as a previous employer on her job application. Decl. of L. Horras, *Padilla v. Sacks & Sacks, LLP*, ECF No. 143, No. 1:19-cv-10021 (GBD) (KHP) (S.D.N.Y.). The court declined to quash a subpoena seeking the other firm's records, because those records would "allow Defendants to determine whether Plaintiff lied on her employment application" and "could impact Plaintiff's available remedies at trial." No. 19-cv-10021 (GBD) (KHP), 2021 WL 4429785, at *3 (S.D.N.Y. Sept. 27, 2021) (citing, *inter alia*, *McKennon*, 513 U.S. at 360-62). In summary, an after-acquired evidence defense will support a targeted inquiry into the plaintiff's prior employment records when the defendant comes forward with some reason to believe that the inquiry will reveal evidence of terminable misconduct, but not otherwise.

**B.    Application to the Defendant's Subpoena**

The Court will begin its analysis of the Plaintiff's motion to quash by observing that he has the standing to make it. The subpoena seeks his employment records (ECF No. 82-2), and as noted above, it is well established that a party has "a personal right with respect to information contained in his employment records" with his prior employer. *Chamberlain*, 2007 WL 2786421, at *1. Indeed, Kraft Heinz does not dispute this point. (*See generally* Opp'n, ECF No. 89.) Having thus addressed the question of standing, the Court will now address each subpoena request in turn.

**1.    *Request No. 1***

In Request No. 1, Kraft Heinz asks Pepperidge Farm to produce any "[c]opies of applications for employment, offer letters or employment agreements, compensation records, and termination information relating to Plaintiff." (ECF No. 82-2, at 5.) In the parties' meet and confer session, Kraft Heinz offered to limit this request to "documents that identify when [the Plaintiff's]

employment ended." (ECF No. 89, at 6.) It therefore does not argue in its opposition paper that the Plaintiff's Pepperidge Farm application, offer letter, or employment agreement are relevant. (*See generally id.*) But it wants to see Pepperidge Farm's records concerning the date of the Plaintiff's separation, because it suspects that he may have been moonlighting with Pepperidge Farm while employed by Kraft Heinz. (*See id.* at 12.)

In an effort to raise this suspicion above the level of speculation, Kraft Heinz cites three principal pieces of information. First, it notes that the "Plaintiff claims to have worked at Pepperidge Farm for three months in 2020 but his wages were nearly equal to years prior when he worked for a full twelve months." (*Id.*) Second, it says that the Plaintiff "could not explain this discrepancy" at his deposition. (*Id.*) (citing Pl.'s Depo. Tr., at 109-10). Third, through other efforts it has discovered an e-mail in which the Plaintiff "sought to hold multiple employment positions while employed at Kraft Heinz." (*Id.*) In the e-mail, the Plaintiff asked a prospective employer if it would be willing to "allow [him] to work on the side," fueling Kraft Heinz's suspicion that he was doing the same while employed there. (ECF No. 94, at 10.)

Although the Court suspects that there are likelier explanations than moonlighting – the Plaintiff's seemingly excess compensation, for example, may be explained by a separation package (*see* Pl.'s Depo. Tr., ECF No. 89, at 74-75) – it also concludes that Kraft Heinz has come forward with enough information to support a narrow, targeted inquiry into the end date of the Plaintiff's employment at Pepperidge Farm. As noted above, the concept of relevance is given a broad construction at the discovery phase of the case, *Conservation L. Found.*, 2023 WL 5434760, at *10, and there is nothing particularly intrusive about a limited inquiry into the dates of the Plaintiff's employment. The subpoena is ordered modified so that Request No. 1 will read: "Documents sufficient to show the end date of the Plaintiff's employment with Pepperidge Farm."

## 2. Request No. 2

In Request No. 2, Kraft Heinz seeks "[d]ocuments that identify Plaintiff's position(s) and a description of his duties for each position with Pepperidge Farm." (ECF No. 82-2, at 5.) Through other discovery, it has obtained a copy of a resumé that the Plaintiff sent out to other, prospective employers. (ECF No. 94, at 4.) In that resumé, the Plaintiff described his position with Kraft Heinz as a "Director of Sales, Metro Division." (*Id.*) Kraft Heinz states that he was never a "Director of Sales," but rather only a "Customer Business Lead and *Associate* Director." (ECF No. 89, at 10.) Concluding that the Plaintiff lied on this resumé, Kraft Heinz wants to know whether he lied on any others – including the one that he submitted to Kraft Heinz when he applied in early 2020. (*Id.* at 10-11.) In particular, it wants to know whether the Plaintiff's claim to have been a "Director of Sales" at Pepperidge Farm is true. (*Id.*) It adds that if the representation was false, it "would likely have terminated Plaintiff for Cause" if it had found out during his term of employment. (*Id.* at 11.)

The Plaintiff says that there is an innocuous explanation for the entry on his resumé. (ECF No. 90-1, at 2-3.) He explains that he used the term "Director of Sales" because it was "'verbiage that outside companies would understand,' whereas 'Kraft Heinz vernacular with positions doesn't necessarily relate to outside organizations.'" (*Id.*) He adds that he is "not aware of anyone at Kraft Heinz whose actual title was 'Director of Sales.'" (*Id.* at 3.)

The Plaintiff's explanation may ultimately prove to be the correct one, but the Court nonetheless concludes that Kraft Heinz has come forward with enough information to support targeted discovery into his job title and duties at Pepperidge Farm. At the same time, Request No. 2 is phrased more broadly than necessary for that narrow inquiry. In seeking *all* documents that identify the Plaintiff's position and job duties, the request may encompass every pay stub that has

his job title at the top, every performance review that measures his progress against his job duties, *etc*. (ECF No. 82-2, at 5), and Kraft Heinz has not sufficiently justified so expansive an intrusion into his prior employment records. Accordingly, the subpoena is ordered modified so that Request No. 2 will read: "Documents sufficient to identify the Plaintiff's position(s) with Pepperidge Farm, and the job description for each such position."

### 3.     *Request No. 3*

In Request No. 3, Kraft Heinz requests "[d]ocuments or communications that reflect the reasons why Plaintiff no longer works for Pepperidge Farm, including but not limited to any separation agreement, severance agreement or reduction in force agreement entered into between Pepperidge Farm and Plaintiff." (*Id.*) It says that this request is relevant to its moonlighting theory because his alleged inability to "recall[] why . . . his employment with Pepperidge Farm ended raises an inference that he worked at Pepperidge Farm beyond the three months he claims, in violation of Kraft Heinz's policies." (ECF No. 89, at 12.) It adds that the requested information would also be "relevant to . . . Plaintiff's character and credibility." (*Id.*)

While the question of *when* the Plaintiff left Pepperidge Farm is relevant to Kraft Heinz's after-acquired evidence defense (*see* discussion, Section II.B.2 *supra*), the Court concludes that the question of *why* he left is not. Kraft Heinz has not identified a consequential fact, material to the success or failure of that defense, that will be rendered more or less likely by the *why* of the Plaintiff's departure, as opposed to the *when*. (*See generally* ECF No. 89, at 12.) The Plaintiff pointed this out in his reply brief (ECF No. 90-1, at 4), and Kraft Heinz did not meaningfully address it in its sur-reply. (ECF No. 95-1, at 4.)

The Court also declines to authorize this request on the strength of Kraft Heinz's desire to make a generalized inquiry into the Plaintiff's "character and credibility." (ECF No. 89, at 12.)

12

Discovery premised on a claimed need to assess credibility is a complex topic, requiring consideration of (among other things) the likelihood that the requested information will lead to material that is admissible under Federal Rule of Evidence 608(b), the relationship between the subject matter of the alleged deception and the subject matter of the case, and whether the requesting party has a foundation for its inquiry. *Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455, 461-63 (S.D.N.Y. 1988). Here, it is enough to observe that Kraft Heinz has not identified any statements by the Plaintiff about the *why* of his departure from Pepperidge Farm that are sufficiently suspect to justify an exploration of his past employment records on credibility grounds. Its lone citations are to pages 86-87 and 109-110 of his deposition transcript, but those passages concerned the *when*, not the *why*. (ECF No. 89, at 12; Pl.'s Depo. Tr., ECF No. 89, at 86:24-87:2, 109-10.) "To justify an inquiry into facts relevant solely to credibility, the party seeking discovery must . . . have a factual basis for believing that prior acts of deception will be revealed." *Davidson Pipe Co.*, 120 F.R.D. at 463. Kraft Heinz has not shown such a basis with respect to "[d]ocuments or communications that reflect the reasons why Plaintiff no longer works for Pepperidge Farm," and accordingly the Plaintiff's motion to quash will be granted as to Request No. 3.

### 4. Request No. 4

Request No. 4 seeks "[d]ocuments or communications evidencing any stock awards, restricted stock unit (RSU), or long-term incentives that Plaintiff maintained, including any date he may have sold or cashed them out." (ECF No. 82-2, at 5.) Kraft Heinz says that it has an Insider Trading Policy that "prohibits the sale of stock at certain times, including around the time it is announcing its earnings." (ECF No. 89, at 10; *see also* ECF No. 95-1, at 23-25.) It also says that it has a Conflict of Interest Policy that prohibits "owning an interest worth more than $25,000

13

in a Kraft Heinz business partner." (ECF No. 89, at 10; *see also* ECF No. 95-1, at 11-20.) At his deposition, the Plaintiff testified that he had been awarded shares of Pepperidge Farm's corporate parent, the Campbell's Soup Co., and that he had sold shares "between two and four times." (Pl.'s Depo. Tr., ECF No. 89, at 58:12-14.) He could not remember when, however (*id.* at 58:21-23), and Kraft Heinz wants access to Pepperidge Farm's records to determine whether any of his sales constituted termination-worthy violations of the two policies. (ECF No. 89, at 9-10.)

The Plaintiff originally objected on the ground that Kraft Heinz had not produced the policies, and until it did, its "subpoena relie[d] on noting more than impermissible 'speculation.'" (ECF No. 82, at 5) (quoting *Chamberlain*, 2007 WL 2786421, at *3). Kraft Heinz then provided the policies (ECF No. 95-1, at 11-20, 22-28), and the Plaintiff's objections became more substantive. With respect to the Conflict of Interest Policy, he pointed out that it permitted Kraft Heinz employees to hold positions in other public companies so long as those positions did not exceed one percent of shares, "which Plaintiff's shares in Campbell's did not remotely approach." (ECF No. 90-1, at 2; *see also* ECF No. 95-1, at 11 (defining "Significant Financial Interest" for purposes of the Conflict of Interest Policy).) With respect to the Insider Trading Policy, he argued that Kraft Heinz had not identified "any material inside information to which someone in Plaintiff's position would have had access." (ECF No. 90-1, at 2.) Nevertheless, he searched his bank records from the 2020-2022 period in which he worked for Kraft Heinz, and he produced the "one statement that reflected the sale of Campbell's shares." (*Id.*)

Unsatisfied, Kraft Heinz continues to press for information about how the Plaintiff's Pepperidge Farm "incentive program worked," "how many shares he had," and "the value of the shares awarded." (ECF No. 95-1, at 2.) It argues that this information would be relevant to an after-acquired evidence defense based on violations of its Conflict of Interest Policy,

14

notwithstanding the one-percent-of-shares provision, because the policy also "prohibits ownership of 'an interest worth more than $25,000 in a privately-owned company.'" (*Id.* at 3) (quoting Conflict of Interest Policy, ECF No. 95-1, at 13.)  It also argues that the information would be relevant to a defense based on its Insider Trading Policy, because the share sale documented by the bank record was made "around the end of the quarter when earnings are being prepared and released." (*Id.* at 3.)

The Court concludes that Request No. 4 is unsupported by the after-acquired evidence defense because there are insufficient reasons to suppose that Pepperidge Farm's records of the Plaintiff's stock transactions will yield evidence of termination-worthy misconduct.  With respect to the Conflict of Interest Policy, Campbell's is a public rather than a private company, and accordingly the Plaintiff would have had to have held nearly three million shares for there to be even a potential violation.  *Cf. In re Fuwei Films Secs. Litig.*, 634 F. Supp. 2d 419, 426-27 n.3 (S.D.N.Y. 2009) (taking judicial notice of a company's SEC filings); Wall St. J., *Market Data: Campbell Soup Co.*, www.wsj.com/market-data/quotes/US/CPB (last viewed Feb. 6, 2024) (reporting that the company has 298,100,000 shares of stock outstanding).  The Court will not authorize Kraft Heinz's request on the strength of implausible speculation that he might possess such gargantuan holdings.  And with respect to the Insider Trading Policy, the Plaintiff is correct that Kraft Heinz has not "identif[ied] any material inside information to which someone in Plaintiff's position would have had access." (ECF No. 90-1, at 2.)  In Kraft Heinz's own telling, the Plaintiff never rose higher than "Customer Business Lead and Associate Director" (ECF No. 89, at 10), and it has not identified any insider information that such a person would possess.

Finally, Kraft Heinz argues that the motion is moot with respect to Request No. 4 because the parties agreed on what should be produced, but the Court disagrees. (ECF No. 89, at 10.)  The

Plaintiff persuasively explains that no such agreement was reached. (ECF No. 90-1, at 1.) Kraft Heinz says that the Plaintiff agreed to produce documents identifying the number of Pepperidge Farm shares he had been awarded and the dates and prices of any sales (ECF No. 89, at 6, 10), but the Plaintiff responds that he merely offered to acquiesce in the subpoenaing of that information if and only if Kraft Heinz correspondingly withdrew the remainder of its requests – an offer that it did not accept. (ECF No. 90-1, at 1.) Had there been a written agreement on this issue, the Court would have enforced it. *E.g., Kalra v. Adler Pollock & Sheehan, P.C.*, No. 3:18-cv-260 (KAD) (TOF), 2020 WL 7828790, at *4 (D. Conn. Dec. 31, 2020) (noting that Rule 29 authorizes parties to make deals on discovery issues, "[a]nd provided that such agreements are properly memorialized in writing, courts ordinarily enforce them"). But Kraft Heinz has not come forward with such an agreement, and the Court of course cannot enforce an agreement that was never reached. *Wells Fargo Bank, N.A. Trustee v. Konover*, No. 3:05-cv-1924 (CFD) (WIG), 2008 WL 11377755, at *8-10 (D. Conn. June 26, 2008) (holding that discovery agreements are enforceable, but finding that the parties did not agree; "the requirement of a writing is clear"). Because the information sought by Request No. 4 is neither supported by Kraft Heinz's after-acquired evidence defense nor required to be produced under any written discovery agreement, the Plaintiff's motion will be granted with respect to it.

     5. ***Request No. 5***

In Request No. 5, Kraft Heinz asks for "[d]ocuments or communications sufficient to determine those components of Plaintiff's gross pay, as reported on his Form W-2 for 2018, 2019 and 2020." (ECF No. 82-2, at 5.) It says that it needs these documents from Pepperidge Farm because "the Plaintiff was not able to identify the components of his compensation" at his deposition, and because he "could not identify any documents within his possession" that would

explain why he received nearly a year's worth of compensation for only three months of work. (ECF No. 89, at 12-13.) The Plaintiff responds that he did explain the seeming discrepancy; at his deposition, he testified that he had been given a "separation package" during a corporate restructuring. (ECF No. 90-1, at 3; *see also* Pl.'s Depo. Tr., ECF No. 89, at 74-75.) In its sur-reply, Kraft Heinz argues that the Plaintiff's testimony was more equivocal, and that it continues to need Pepperidge Farm's documents to get to the bottom of the issue. (ECF No. 95-1, at 4-5.)

Apart from the moonlighting issue, the Court does not observe any relevance in this inquiry. Kraft Heinz says that "the record here is rife with inconsistencies that are potentially violative of [its] policies," and that information about the Plaintiff's Pepperidge Farm compensation package is therefore "relevant to [its] defenses," but it does not explain how. (ECF No. 89, at 13; *see also* ECF No. 95-1, at 4-5) As noted above, Kraft Heinz has not come forward with sufficient reasons to suppose that anything about the Plaintiff's relationship with Pepperidge Farm was violative of its Insider Trading Policy or Conflict of Interest Policy, aside from a possibility that he might have kept working for Pepperidge Farm after he started with Kraft Heinz. And with the Court's ruling on Request No. 1, Kraft Heinz has been permitted sufficient discovery into that possibility. The subpoena will be quashed as to Request No. 5.

### III. CONCLUSION

In closing, the Court notes that the subpoena evidently had not been served on Pepperidge Farm at the time of the Plaintiff's motion. Presumably the Plaintiff objected after receiving the advance notice required by Fed. R. Civ. P. 45(a)(4), and Kraft Heinz refrained from serving the

subpoena until the objections had been adjudicated. This ruling and order is therefore without prejudice to any objections that Pepperidge Farm may wish to make once it is served.[1]

For the foregoing reasons, the Plaintiff's Motion to Quash (ECF No. 82) is granted in part and denied in part, and Kraft Heinz's subpoena to Pepperidge Farm is ordered:

A. Modified so that Request No. 1 reads: "Documents sufficient to show the end date of the Plaintiff's employment with Pepperidge Farm";

B. Modified so that Request No. 2 reads: "Documents sufficient to identify the Plaintiff's position(s) with Pepperidge Farm, and the job description for each such position"

C. Quashed as to Request Nos. 3, 4, and 5.

This is not a Recommended Ruling, but rather a "determination of [a] nondispositive motion . . . relating to discovery and other matters of procedure." D. Conn. L. Civ. R. 72.1(C)(2). As such, it is reviewable pursuant to the "clearly erroneous" statutory standard of review. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Conn. L. Civ. R. 72.2. It is an order of the Court unless reversed or modified by the District Judge in response to a timely objection under Local Rule 72.2(a).

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge

---

[1] The Court notes that Pepperidge Farm appears to be a Camden, New Jersey company, and the subpoena purports to demand compliance in Stamford, Connecticut. (ECF No. 82-2, at 1, 4.) The distance between those two cities is greater than 100 miles. *See* www.mapquest.com. The Court trusts that in the modified subpoena, Kraft Heinz will either change the production location to comply with Fed. R. Civ. P. 45(c)(2)(A), or will negotiate the method and location of the production in a way that is acceptable to Pepperidge Farm.